[Civ. No. 24449.   Second Dist., Div. Three.   Nov. 15, 1960.]

ROBERT J. HAZEL, Respondent, v. A. D. McGRATH, Appellant.

Parker, Stanbury, Reese & McGee and Daren T. Johnson for Appellant.

Butterworth & Smith and Gene E. Smith for Respondent.

VALLÉE, J.—Appeal by defendant from an adverse judgment entered on a jury verdict in an action for damages for personal injuries. The only question is whether the court committed prejudicial error in refusing to instruct on contributory negligence.

The action arose out of a rear-end collision which occurred about 11 a. m., October 6, 1956, at the intersection of San Fernando Road and Valencia Street in Burbank. San Fer-

nando ran generally north and south. There were two lanes of traffic in each direction divided by a double white line. Valencia intersected San Fernando, forming a T intersection. Two pedestrian crosswalks were marked across San Fernando: one, adjacent to the north side of the intersection; the other, adjacent to the south side. The weather was clear and the street dry. There was "a sign some place out in the crosswalk saying 'Stop for pedestrians.'" There was no regular boulevard stop that faced northbound traffic on San Fernando.

Plaintiff was driving a Studebaker northbound on San Fernando in the lane next to the double white line, called the inside lane. Defendant was driving a Ford northbound also in the inside lane. The front of defendant's car collided with the rear of plaintiff's car as the latter was standing at the southerly edge of the southerly crosswalk.

Plaintiff testified: He had driven an automobile about 30 years. The brakes on his car were good. His car had two stop lights in the rear and the regular rear taillights. When he stepped on the brakes the lights went on; they were in operating condition. He approached the intersection in the inside lane at about 25 miles an hour and an unidentified automobile was in the lane to his right, called the outside lane. This car was about 125 feet north of his car. When the car to his right was about 50 to 75 feet south of Valencia it began to reduce its speed. When he saw it begin to reduce its speed he immediately took his foot off the gas pedal and put it on the brake pedal. At that time he was 175 to 200 feet south of Valencia. He did not apply pressure to the brake immediately but kept his foot on it until he found out why he was stopping. "He slowed up almost to a stop near the corner when I seen a pedestrian step off the curb and then I put on my brakes full." At that time he was about 100 feet to the rear of the car in the lane to his right. He does not recall looking behind him at any time as he was gradually slowing down. He believes he gave a hand signal, "it just comes automatically," but he cannot swear to it; it is a habit he is kind of "religious" about. He continued forward and stopped just "short of the crosswalk." He stopped in 100 to 125 feet. He made a moderate, even stop. He did not skid at any time. "Q. Did you feel the nose of your car dip at all as you were stopping? A. Almost every time I stop my car, the nose goes down. Q. There is a dipping? A. Yes. Q. Did you feel it go back up before the impact occurred? A. Yes. . . . Q. And what occurred then while you were just stopped in that position?

A. I was just to congratulate myself for making a good stop so the pedestrian could go across. I leaned forward and looked at the pedestrian, wondering why he didn't come. Q. Where was he? A. He was standing approximately just past the center of the other car, toward the middle looking back. Q. Looking where? A. Back down San Fernando Road to the south, that would be. Q. Behind your car? A. Yes. Q. Was he moving then or stopped? A. The pedestrian? Q. Yes. A. He was stopped.'' Three or four seconds elapsed between the time he stopped and the time his car was hit in the rear. He had a rear-view mirror in his car. He did not look into the rear-view mirror to see ''what it was behind'' him that ''was absorbing the pedestrian's attention.''

Plaintiff's wife testified: She was seated to her husband's right. She saw the car in the outside lane as ''our'' car was stopping. ''Q. What do you recall about the stop that was made by the Studebaker, the car that you were in? A. It wasn't at all eventful. We simply stopped. Q. Did you hear any squealing of brakes? A. Oh, no, no. Q. Was there any skidding? A. No. Q. That the Studebaker did in coming to stop? A. No. Q. Would you term this stop hasty, abrupt, or how would you describe it yourself? A. Well, it was neither hasty nor abrupt. We simply stopped. That is all. . . . Q. Now, in making this stop again you were seated in the Studebaker? A. Yes. Q. Were you holding onto anything or were you just seated in the car? A. I really couldn't remember that. Q. Do you recall being moved at all from the position that you were in by the stop that you made? Were you inclined forward at all by the stop that you made? A. I couldn't say. Q. Do you have any recollection that you were? A. No, I don't.'' She saw the pedestrian in the crosswalk in front of the car stopped to their right.

Defendant testified: He left the outside lane and moved into the inside lane about a block south of Valencia. When he did so he saw plaintiff's car in the inside lane northbound. He followed behind plaintiff's car at a distance of about three car lengths. After he changed lanes he made no further observation of the lane to his right. Both cars maintained a speed of 25 to 30 miles an hour. He was aware there was traffic in the lane to his right but he cannot say whether it was moving or stopped during the time he traveled the entire block to Valencia in the inside lane. In traveling this last block his range of vision was such that he saw the entire roadway ahead. ''Q. And did you follow behind Mr. Hazel's car during that

last block and before anything unusual happened? A. I was back of it apparently but a short time when Mr. Hazel, the car ahead of me which was driven by Mr. Hazel, came to a sudden halt or stop.'' ''Q. I believe you told us that the car driven by Mr. Hazel came to an abrupt stop? A. Yes, sir. Q. Did you observe that abrupt stop yourself with your own eyes? A. Yes, sir. Q. [W]hen that happened, when he came to that abrupt stop, did you notice anything unusual about the motion of his car as such aside from the fact that his speed decreased? A. It must be kept in mind that this happened very quickly. It was observed and immediately upon seeing it, I applied the brakes in the car I was driving and of course the distance was close and there wasn't enough distance to bring the car to a complete halt prior to the time that I came in contact with Mr. Hazel's car. . . . Q. . . . What did you do in the operation of your car when you saw the Hazel car come to this abrupt stop? A. Well, I immediately put on my brakes, which they grabbed and took hold, and the car was brought to a stop but not before it came in contact with the Hazel car. At that point the nose of the Ford, the front end of it was down. That I do recall. And it did have—my impression is that the Studebaker had just stopped and the end still seemed to be elevated and I seemed to hit it, seemed to go under a little bit and then stayed right there and the Hazel car seemed to move forward one or two car lengths.'' The brakes on his car held. They were in good operating condition. ''Q. What distance separated the back of Mr. Hazel's car from the front of yours at the time you went for your brake pedal? A. This was an estimate that I made. Q. I am asking you now what is your estimate? A. It would be approximately two lengths. Q. About two car lengths? A. Yes.'' ''Q. . . . Is it correct then that the Hazel car was stopped when you applied your brakes or do you remember? A. The Hazel car, as I observed it and as I have earlier stated, was coming to an abrupt stop or sudden stop when I applied my brakes.'' He has no recollection of seeing plaintiff's car skid to a stop. ''Q. Were you watching the Hazel car constantly as you were following it during, say, the last hundred feet that you drove toward Valencia? . A. I have to tell you that I am sure that I was. Q. And did you see it begin to decrease speed from the speed of 25 to 30 that it had been traveling? A. I didn't recognize any decrease in speed but what I realized was the suddenness of the stop. Q. It traveled, I take it, some distance during the time that it came to a stop. In other words, it wasn't going along at 25 to 30

and then suddenly cease motion? A. No." "Q. And when you got behind the Studebaker upon this change of lanes, what happened then? A. Well, at the point of reaching the intersection of Valencia, the Studebaker came to an abrupt stop and I applied my brakes and set my nose right on end, and the Studebaker had its tail up because it had stopped, and I slipped underneath it. And that was the point of contact. Q. How far was the Studebaker from Valencia; by that I mean the front end of the Studebaker, when you first observed it decrease speed? A. I couldn't tell you on the front end. I would have to tell you the distance between the back end and the front end of the Ford. When I first noticed it, it had come to a quick stop and, of course, with that I automatically came to a stop, too. To give you exact feet, I could not do it honestly or give you an—an approximation is all I can give you." On seeing plaintiff come to a stop he immediately applied his brakes. At that time the cars were two car lengths apart. In braking, he reduced his speed from 25 to 30 miles an hour down to 5 to 10 miles an hour. At that speed he collided with plaintiff's car. The front of plaintiff's car tipped forward and the rear end elevated during the sudden stop. His car "seemed to go under a little bit." His car came to rest at the point of impact. Plaintiff's car moved forward one or two car lengths. He did not observe plaintiff's car travel any distance while it was stopping. He did not see it reduce speed before it came to a stop. He did see plaintiff's car come to a stop. He heard no sound from plaintiff's car before the collision. He heard no screech of brakes. He does not know whether the brake lights on the rear of plaintiff's car illuminated at any time. He does not know whether plaintiff gave a signal of his intention to stop. He did not apply his brakes before plaintiff's car was completely stopped. The brakes on his car locked and the car skidded some distance before colliding with the rear of plaintiff's stopped car. At the moment of impact, but not before, he observed that the rear bumper of plaintiff's car was slightly raised and the front end of his car was depressed.

Defendant argues the jury should have been allowed to determine whether plaintiff failed to exercise ordinary care by his admitted failure to make any observations for traffic behind him before bringing his car to a stop, whether it was a sudden, abrupt stop as defendant testified, or a moderate, even stop as plaintiff testified; that the jury could have concluded plaintiff was guilty of contributory negligence by bringing his vehicle to a sudden stop.

█ It is the duty of the court to instruct the jury on every theory of the case finding support in the evidence. (*Rideau* v. *Los Angeles Transit Lines*, 124 Cal.App.2d 466, 469 [268 P.2d 772].)

█ Viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to defendant's contention, as we must, we are of the opinion there was enough evidence to require the giving of the instructions. Plaintiff was traveling north at a speed of 25 to 30 miles an hour. Defendant was following in the same lane about 48 feet behind plaintiff at a speed of 25 to 30 miles an hour. Plaintiff saw a pedestrian in the southerly crosswalk at Valencia. Defendant did not see the pedestrian. Plaintiff did not reduce his speed until he was so close to the crosswalk that the only way he could yield the right of way to the pedestrian was to come to a sudden stop. Plaintiff did not give a hand signal signifying he was going to stop. He came to a sudden, abrupt stop. The rear of his car was hit at the moment it stopped. Defendant's testimony that plaintiff made a sudden, abrupt stop is supported by plaintiff's testimony that he felt the nose of his car dip as he was stopping and felt "it go back up" before the impact. We think the jury could have inferred that plaintiff was negligent and that his negligence contributed to the accident.

"Cases involving rear-end collisions are legion. Although the contention is made often that the leader alone, or the follower alone, is guilty of negligence, in general, it has been held that the case as presented by each party creates a question of fact for the jury and not a question of law for the court. . . . The reasonableness of the speed at which defendant operated his vehicle, whether plaintiff gave a hand signal indicating an intention to stop [citation], whether the stop was sudden, whether defendant was driving too closely behind plaintiff's vehicle, whether defendant was inattentive, all were questions of fact." (*Lowenthal* v. *Mortimer*, 125 Cal.App.2d 636, 638, 639 [270 P.2d 942].)

Whether plaintiff was contributively negligent was a question of fact and the issue should have been submitted to the jury. The case was a close one. We cannot say that the result would have been the same had the instructions on contributory negligence been given.

Reversed.

Shinn, P. J., and Ford, J., concurred.